UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 25-cr-10024-RGS |
| | ) | |
| JAMES FLORENCE, Jr., | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

James Florence, Jr. ("FLORENCE" or "defendant") is a serial cyberstalker, who over the course of more than a decade has tormented more than a dozen women in his life; women who were family, close friends, and even intimate partners. He presented as a friend, a loved one, and an ally; and all the while he was, in actuality carefully and callously cultivating, and carrying out his disturbing crimes. Even more disquieting, he led this duplicative double life, this secret betrayal, all while hiding under the very blanket of confidence and deference he was afforded by the very women he victimized in the dark.  However, in the light of day it is crystal clear that FLORENCE used his computer skills and ingenuity to turn the lives of these women, and the people around them, into waking nightmares.   FLORENCE emotionally abused each of them,  through relentless and demeaning language and online postings, by humiliating them, through creating and sharing A.I. generated pornography of them, stealing their underwear to both shame them and conduct openly perverse fantasies with other likeminded individuals, and by encouraging others online to sextort and torment these women. For these victims – there was no safe space – at every turn they were haunted in their professional and personal lives.  At the stroke of a key, FLORENCE inflicted lasting harm on these women — harm that in several cases changed the way they relate to the world.  And he did this all while hiding cowardly behind a keyboard.

His sophisticated use of anonymizing techniques, overseas providers, and careful operational planning allowed him to avoid detection – and punishment – for far too long.  But it is now time for

FLORENCE to face the consequences of his predatory predilections and destructive actions, and for the Court to protect the public from this dangerous defendant. To punish this conduct, to protect the public from this perilous perpetrator, and to deter him, and others from weaponizing the digital tools of modern life, the United States respectfully requests that the Court sentence the defendant to a high-end Guidelines sentence of 108 months incarcerated, followed by 60 months of supervised release.

## I. INTRODUCTION

On April 17, 2025, the United States District Court (Stearns, J.) accepted the defendant's waiver of indictment and his change of plea to an Information, charging FLORENCE with seven counts of cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

FLORENCE faces the following maximum penalties on Counts One through Seven of the Information: a sentence of up to 5 years of incarceration; supervised release for three years; a fine of $250,000; and a mandatory special assessment of $100, on each of these Counts. FLORENCE faces the following maximum penalties on Count Eight of the Information: a sentence of up to 20 years of incarceration; supervised release of five years to life; a fine of $250,000; a mandatory special assessment of $100; a discretionary special assessment under 18 U.S.C. § 3014 of $5,000; and a discretionary special assessment under 18 U.S.C. § 2259A for distribution/possession of $17,000.

## II. OFFENSE CONDUCT

From in or about January of 2014 through September 11, 2024, FLORENCE engaged in an extensive cyberstalking campaign targeting Victim 1 and those associated with her. During the same timeframe (in some cases going back to 2008), FLORENCE also engaged in separate cyberstalking activity aimed at other victims. FLORENCE used a variety of techniques and methods to harass and intimidate his victims and others in the community, including making fake nude images of the victims, doxing or exposing victims' personal information, creating vulgar fake accounts in the

2

victims' names, and accessing online accounts without authorization (i.e. "hacking") the victims' accounts.

FLORENCE's cyberstalking campaigns included:

- obtaining-and then widely distributing-private information about the victims, which included private photographs or photographs shared amongst friends on social media. These photographs were frequently doctored to appear sexual or pornographic in nature;

- accessing online accounts without authorization;

- creating accounts in the name of his victims and soliciting fantasy sexual encounters on their behalf, and in the case of one victim, those fabricated sexual encounters included: building a profile of that victim on an interactive platform, which included information about the victim's apparent preference for G-strings and thongs, that she was sexually adventurous, used sex toys and had a sex swing in her home, and listed her actual home address;

- posing as his victims by creating impersonation accounts in their names and then posting or sending various harmful content from those accounts;

- encouraging others to extort, shame, defame, and intimidate victims for pornographic material; and

- stealing victims' underwear and using photos of the underwear to both harass those victims or engage with others on the internet to further mutual sexual fantasies.



| total_uploads | biography (profile bio) |
| --- | --- |
| 156 | Lets Expose [redacted] Post Professor Bimbo Everywhere. Make Her Famous. Make Her A Webslut |
| 41 | |
| 212 | Exposing Professor Bimbo, AKA [redacted] Be Sure To Save Her Pics And Share Her Everywhere! |
| 67 | |
| 127 | Here To Expose [redacted] Make Her Famous. Make Her A Webslut. "Professor Bimbo" |
| 0 | |
| 84 | Here To Expose [redacted] AKA Professor Bimbo. Make Her Famous. Make Her A Webslut |
| 687 | |



FLORENCE employed a number of techniques to hide his identity online, for example, by using Virtual Private Network ("VPN") services; using anonymous overseas "revenge porn" websites; and using foreign encrypted email providers that do not respond to United States law enforcement and/or do not maintain IP logs or other records.

FLORENCE has significant knowledge of and experience with computers and was previously employed at software companies, as well as at an emerging technology organization, performing work for the United States government.

FLORENCE was an Information Technology professional who had worked for 10 years at MIT Lincoln Laboratory and had a DoD "Secret" clearance. According to his own resume, part of FLORENCE's responsibilities included the planning, configuring, purchasing, and building of hardware and software and cybersecurity implementation.

4

FLORENCE used his expertise to employ several techniques to hide his online identity and criminal activities. For example, he utilized services that anonymize IP addresses, Virtual Private Networks, and foreign encrypted email, and other online platform providers that are not required to respond to United States law enforcement. In addition, FLORENCE built his desktop computer and encrypted part of the hard drive, configuring the computer to require decryption using a separate thumb drive at the time the computer was booted up. FLORENCE also used virtualization technologies to potentially obfuscate his conduct as these files require additional forensic processing.

After his arrest and subsequent detention in September of 2024, FLORENCE asked a friend during a jail call to remove a box located under his bed and place it into FLORENCE's storage unit. FLORENCE described the contents as "clothes" and "kink stuff" and insinuated they were associated with his girlfriend. FLORENCE further instructed this friend to "make something up" if his parents asked about what was inside the box. Law enforcement previously identified the box's contents as underwear, bras, and other items FLORENCE stole and used to harass, scare, and distress several victims by sending them photos of the items with taunting or provocative messages.



## VICTIM 1

In late 2017, FLORENCE posted an advertisement, which included a photograph of Victim 1's underwear on Craigslist, in a section of the website soliciting casual sexual encounters. The

advertisement was created to look as if it was posted by Victim 1.

At some point in 2020 or prior to 2020, FLORENCE created several Twitter accounts and used them to send Victim 1 the same photos of her underwear, claiming to be in possession of them. FLORENCE also created another account that included Victim 1's first name and "32DD" which he used to post photos of the underwear. FLORENCE used those accounts to "tag" Victim 1's real Twitter account to those vulgar tweets, which meant that they (underwear tweets, etc.) were directly linked to the Victim's twitter account. The Victim had to delete her Twitter account as a result.

At some point in February 2023 or prior to February 2023, FLORENCE posted images of Victim 1 on the website www.ladies.exposed. Images included a variety of photo collages that included images that had been edited to make Victim 1 appear to be nude or semi-nude, and included a photo of Victim 1's actual driver's license, Victim 1's then true phone number, true email addresses, true home address, a photo of Victim 1's then current residence, and Victim 1's professional information. Captions of the uploaded images included "Own & Share [Victim 1] – Make This Whore Famous", "Humiliate & Share Webslut [Victim 1]", and "Fully Exposed Webslut [Victim 1]. Post & Share Her Everywhere. Make The Whore Famous".

As a result of these postings, messages were sent to Victim 1 via email and text message by individuals unknown to her. These emails included threats to disseminate Victim 1's images to coworkers and/or students if she did not comply with the senders' demands, which included a demand that she produce sexual images.

In May of 2023, FLORENCE posted Victim 1's personal information, including personal email addresses, home address, professional contact information, account passwords, and even a list of hair colors Victim 1 has dyed her hair, on publicly accessible websites.

Between June of 2023 and April of 2024, FLORENCE created at least seven Reddit accounts utilizing Victim 1's name and images. At least three of the Reddit accounts posted digitally altered

images depicting Victim 1 as nude or semi-nude. FLORENCE posted a photo of Victim 1's driver's license (with information such as her address) and included the message "Accept It Your Exposure Is Permanent Slut" in the biography section of the user profile. This same Reddit account also posted a section titled "Fan Tributes" consisting of eight photos of erect penises in front of a digital image of Victim 1. The section ended with the statement "Enjoy Your Exposure You Naughty Bimbo. You Belong To The Internet."

Victim 1's name, image, and personal information was also used by FLORENCE to create at least three artificial intelligence-driven chatbots on two different platforms between approximately September of 2023 and July of 2024. The chatbots were programmed with Victim 1's personal and professional information which would then inform the chatbot on how to respond to users during a chat. By way of example, if another user interacting with the chatbot asked the "Victim 1" profile, created by FLORENCE, where she lived, the chatbot could provide Victim 1's true home address followed by "Why don't you come over?"

Victim 1's images, including images altered to make Victim 1 appear nude or semi-nude, were posted by FLORENCE to numerous photo-sharing and/or pornography platforms where users could view, download, and/or comment on the images. On one particular website, users posted comments such as "Mmmmm sizzling hot piss and cum target" and "Follow me to the toilets and show me your big tits! Then get on your knees and suck my cock before I bend you over and fuck you against the toilet door! As a cheap whore!"

FLORENCE posted Victim 1's name, image, and/or other personal information on at least 15 websites. At least 30 unique accounts were used by FLORENCE to harass, impersonate, or otherwise cause Victim 1 substantial emotional distress. To date, Victim 1 has received dozens of distressing text messages, emails, or calls from unknown senders addressed to Victim 1 discussing her image and information posted online through August of 2024.

On Wednesday, September 11, 2024, following the execution of a federal search warrant at FLORENCE's residence, federal agents located dozens of pairs of women's underwear in multiple places in the home, including underwear belonging to Victim 1.  The FBI also identified a cell phone case displaying an image of Victim 1, printed on the back of the case, in a bikini, amongst all the stolen underwear.

Federal agents also located and then forensically examined numerous digital devices. Numerous photos of Victim 1, including the image printed on the cell phone case and others used in impersonation and harassment accounts, and photos of Victim 1's underwear were found on FLORENCE's Pixel 6 Pro mobile device and in a Dropbox, account belonging to FLORENCE. Screenshots from FLORENCE's Snapchat account showed his account's "My AI", which is a chatbot on Snapchat that uses artificial intelligence to answer questions, make recommendations, and help with other tasks, bore a striking resemblance to Victim 1 in a particular image she posted on her own social media accounts that was ultimately used by FLORENCE in several harassing accounts. Passwords associated with Victim 1 were also found in a text file on FLORENCE's desktop computer.

During that forensic review agents identified at least an additional thirteen victims who were victimized by FLORENCE; six of those additional victims were subjected to criminal conduct by FLORENCE that occurred within the statute of limitations for charging that conduct.

Furthermore, agents recovered 62 images and four videos of child pornography in a folder labeled "FF Models\Sandra" on FLORENCE's Seagate hard drive.  The images and videos depicted females between the ages of approximately six and fourteen years of age.

<u>VICTIM 2</u>

In or around 2011, FLORENCE created a Facebook account using Victim 2's name and likeness.  The account appeared to be a copy of Victim 2's true Facebook account at that time. Shortly

8

after becoming aware of this duplicate account, Victim 2 began receiving messages on Facebook from men she didn't know. These accounts sent Victim 2 photographs of her own underwear.

In or around 2013, FLORENCE created a MySpace account and posted nude, explicit or provocative photographs of Victim 2, which depicted Victim 2's face on other women's bodies. A few months later, a friend of Victim 2 notified her of a Facebook account, which FLORENCE had created, which had posted numerous photographs of Victim 2's face on various bodies, including images depicting nudity; there were approximately 20 different profile photos of her associated with this account. All of the photos that were explicit, nude, or semi-nude, contained Victim 2's true face on another person's body. The account also contained personally identifying information about Victim 2, including her name and high school.

In addition to Facebook, FLORENCE posted photos of Victim 2, including digitally altered photos of her to make her look provocative or sexualized, on other websites on the internet, including Classmates.com, which was still active and visible as of December 2024.

In and around 2013, FLORENCE added (friended) the accounts of other classmates and friends of Victim 2 using the false Facebook account, which included images depicting Victim 2's face on the nude bodies of other women. This act made the content of that account available to the friends and classmates of Victim 2. Victim 2 was regularly teased and harassed at school by others who had seen the explicit photos.

On May 26, 2018, FLORENCE reached out to Victim 2 on Facebook using a profile with a false name and photo, asking her if she was accepting payment for Snapchat photos or her underwear. Using the same false account, FLORENCE sent another message to Victim 2 in October of 2020 stating, "let me pay to see that body [Victim 2]".

In February of 2021 and continuing until at least July 21, 2022, FLORENCE communicated with Victim 2 through a different false account on Facebook. These messages contained at least one

photo of Victim 2's underwear.   The photo was accompanied by messages like "this thong look familiar, [Victim 2]?", "i love your panties, [Victim 2]", and " I have 2 more pairs too".

During the execution of the search warrant at FLORENCE's residence, agents located underwear which belonged to Victim 2.  In addition, numerous explicit photos featuring Victim 2's face on the body of other women were located on a Seagate hard drive found in FLORENCE's home.

Victim 2 told investigators she perceived the continuous harassment as something that would never leave her alone.  The altered images and fake accounts were created to try and "make people look at [her] differently."   Victim 2 suffered from extreme anxiety stemming from the ongoing experience.  Victim 2 considered FLORENCE an extension of her family and treated him just like a brother.  The fact that FLORENCE, a trusted person in her family, was responsible for her harassment made Victim 2 stressed and angry.

<u>VICTIM 3</u>

In or around of the end of 2008 or the beginning of 2009, FLORENCE contacted Victim 3, who was approximately 15 years old at the time, utilizing a MySpace account with the username "ilove [Victim 3]".  The MySpace account contained photos of Victim 3, which were not explicit but nevertheless made her uncomfortable.  FLORENCE used the account to anonymously message that he had "feelings" for Victim 3.

Approximately one year later, Victim 3's password for her Myspace account was changed without her knowledge and she was locked out of her account.  At about the same time, FLORENCE compromised Victim 3's AOL account.  Victim 3's AOL Instant Messenger account was changed to list "sensual message" under her name in the bio.  The account also contained a link to a MySpace account with explicit photographs of Victim 3, which depicted her face on numerous provocative, nude, or semi-nude images.

In March 2010, FLORENCE created an account on the photo sharing website Flickr with a

username that Victim 3 had previously used.  This account also used an image of Victim 3 as the profile picture. The account contained over 112 images of Victim 3, most of them were provocative in nature and three of which included the text "JAILBAIT." The account also displayed a photo of underwear laid out on a bed with the text "STOLEN JAILBAIT PANTIES" and "She knows they're missing." The Flickr account contained a link to the website [Victim 3 first and middle names].tk which described itself as "the official [Victim 3] fan page" and encouraged others to "Get your fix of this sexy teen queen!".

Victim 3 was underage at start of FLORENCE's anonymous online contact. It was subsequently learned that Victim 3's aunt and two of her brothers had confronted FLORENCE on separate occasions about the posts online and their inappropriateness, believing he could be responsible for it. The defendant denied any involvement in spite of the truth, and then he  continued his torment of Victim 3 nevertheless. At least two of these confrontations occurred between approximately 2008 and 2010. Victim 3 had suicidal thoughts around this time-period. Underage photos of Victim 3 (non-explicit) and her teenage underwear with captions such as "JAILBAIT/Because the best things in life are illegal" and "Stolen Jailbait Panties/She knows they're missing" were still up on the open web as recently as December 2024.

In April or May of 2012, when Victim 3 was a senior in high school, Victim 3 became aware of an impersonation account in her name on Facebook.  This account had been created by FLORENCE.  This account publicly listed her address and phone number and included altered explicit, nude, or semi-nude photos of Victim 3.  Victim 3 endured persistent sexual harassment as a result of these postings.  At or near this same time, FLORENCE also took control of Victim 3's actual Facebook account, which he continued to access and utilize as late as November of 2022.

In 2013, FLORENCE took over Victim 3's YouTube account.  FLORENCE subsequently posted an altered photo depicting Victim 3's face on a female body wearing only a t-shirt and

underwear.  During this same period of time, Victim 3 was informed by a family friend that an image of her, which was altered to appear as if she had semen on her face, had been posted on the internet. FLORENCE created impersonation accounts in Victim 3's name on multiple platforms like OkCupid, Twitter, Gmail, Yahoo, AOL Instant Messenger, and Facebook, some of which were active recently as May of 2024.  However, the Twitter account is still publicly viewable on the platform as of February 2025, Twitter/X has denied a request made on behalf of Victim 3 to take down this account.

Between 2017 and 2024, FLORENCE engaged in Google searches, including image searches, involving Victim 3's full name with the terms "nude", "xxx", "jailbait", "15 yr old photo gallery" and "teen queen".  FLORENCE also had notifications set up to notify him of any biographical changes associated with Victim 3 on a data aggregating website.

During the execution of the search warrant at FLORENCE's residence, agents recovered underwear belonging to Victim 3 in FLORENCE's home.  Agents also located several of the provocative images of Victim 3 that were posted to the internet by FLORENCE, along with additional digitally altered images of Victim 3, which put her face on nude or semi-nude bodies.

Victim 3 was the younger sister of FLORENCE's friends (Victim 3's brothers).  Victim 3 was deeply psychologically impacted by the experience and felt extremely isolated as this was happening when she was still a minor.  She recalled feeling hopeless during high school and had suicidal thoughts.  She could not bear continuing to find out about new accounts and photos of her posted online and stopped looking herself up for her own mental sanity. Victim 3 struggled with anxiety and trusting others to this day due to her experience.

<u>VICTIM 4</u>

In 2008, FLORENCE created a Yahoo email account and a Facebook account in Victim 4's name.  In 2009, FLORENCE created a Classmates.com account in Victim 4's name, which was

ultimately terminated by the site administrator for posting "inappropriate photos".

In 2010, FLORENCE created a Twitter account in Victim 4's name with digitally altered nude or semi-nude images of her on its profile. These images were public until a request was made on Victim 4's behalf to take the account down in February 2025.

In September of 2011, FLORENCE emailed himself at least three images of Victim 4, which had been altered to depict Victim 4's face on other women's nude, or semi-nude, bodies.

Sometime in 2011, FLORENCE took over Victim 4's Facebook account and posted fake semi-nude photos of Victim 4, which depicted Victim 4's face on other women's semi-nude bodies. Victim 4 wondered "who is out to get me?"

In 2012, FLORENCE created second and third Classmates.com accounts in Victim 4's name, at least one of which displayed a digitally altered photo that made her appear nude as the profile photo.

In or about 2019, FLORENCE posted explicit photos of Victim 4 on an escort website, which made Victim 4 feel "sick to [her] stomach".

Following the execution of the search warrant, images of Victim 4 were found on FLORENCE's phone that had been altered to include written text over the photos with sexual overtures to the viewer such as, "I have till 6. Come over and fuck me."

On February 28, 2023, FLORENCE uploaded a number of images of Victim 4, on multiple occasions to the website www.ladies.exposed.com with captions that included "My Cousin [Victim 4] Risk", "My Cousin [Victim 4] Risked", "My Cousin [Victim 4]", "risk my cousin [Victim 4] fucked her", "risk fucking my cousin [Victim 4]", and "risk. Fucked my cousin [Victim 4]". When a user of the website included the word "risk" in the caption, it indicated to other users of the site that the photo should be screenshot and reposted (since the original post would expire in a short timeframe) or sent to the victim with the word "caught".

FLORENCE created impersonation accounts using Victim 4's name, information, and, in some instances, fake nude images on platforms like OkCupid, Twitter, Yahoo, Classmates.com, and Facebook, some of which had been accessed as recently as June 2024. However, some of these accounts are still publicly viewable on the platform as recently as February 2025.

<u>VICTIM 5</u>

In or before 2013, FLORENCE created a Plenty of Fish dating profile in Victim 5's name, image, and personal information. FLORENCE used images of Victim 5 from her Facebook account, including one of her with her daughter (Victim 7). FLORENCE also posted a digitally altered photo of Victim 5 to this account to make her appear semi-nude.

In and around October of 2022, FLORENCE posted ads on Craigslist offering Victim 5's underwear to share with others with a similar fetish, identifying her as a friend as well as by first name.

On February 28, 2023, FLORENCE uploaded one image of Victim 5 to www.ladies.exposed with the caption, "Risking [Victim 5] Upskirt. I steal her socks & panties". Then again on March 3, 2023, FLORENCE uploaded one image of Victim 5 to www.ladies.exposed with the caption, "[Victim 5] Upskirt Risk".

FLORENCE created at least two Classmates.com accounts in Victim 5's name and image, one in 2012 and one in 2023.

On diverse dates in 2022 and 2023. FLORENCE took voyeuristic or surreptitious photos of Victim 5 often from behind her when they spent time together. FLORENCE also had notifications set up to notify him of any biographical changes associated with Victim 5 on a data aggregating website.

During a forensic review of FLORENCE's devices, agents located at least eleven homemade digital wallpapers on FLORENCE's Pixel 6 Pro phone with Victim 5's likeness and her full name,

which also refer to her as an "Asian baby factory". Also recovered from that phone by agents were several voyeuristic photos of Victim 5 from behind her in a hotel and other locations. A digitally altered image of Victim 5 to make her appear topless was also found on FLORENCE's mobile device that appeared to be the same image as was used to make Victim 1 appear topless. Agents located a website banner, which read "PervOn [Victim 5]" and a text file with passwords for unknown accounts attributed to Victim 5 on FLORENCE's desktop.

Victim 5 considered FLORENCE a close friend for a large part of their almost 20-year friendship. After she became aware of fake accounts in her name and image, she felt "violated" and "disturbed". Victim 5 was nervous even going to the grocery store in case anyone she came across had thought they talked to her online. Victim 5 believed FLORENCE had taken advantage of "trusted moments" and learning he was responsible had "shaken up [her] belief system".

<u>VICTIM 6</u>

Victim 6 was underage at the time FLORENCE started grooming her. FLORENCE eventually convinced her to send compromising photos of herself that he likely posted as he labeled them as "teen" content. FLORENCE provided a cell phone and shelter to her (she lived with his parents) during a period that Victim 6 experienced an unstable family situation but continued to harass and abuse her.

Beginning in June of 2020 and continuing to September of 2024, on numerous occasions, FLORENCE uploaded numerous nude and pornographic images and videos of Victim 6 to several websites, including, but not limited to, www.ladies.exposed. Many of these images and videos were surreptitiously recorded from intimate relations between FLORENCE and Victim 6 without Victim 6's knowledge. FLORENCE included comments or captions such as "love this whore", "teen whore [Victim 6] exposed", "Teen Slut [Victim 6] Ass Risk", "Teen Slut [Victim 6] BJ Risk", "Teen Slut [Victim 6] Panties Risk", and numerous others when he posted these images and videos. The photos

on at least one of the websites were still up as of November 2024.

FLORENCE created at least three accounts with the username "exposemywife[Victim 6]" or "Web Wife [Victim 6]" on platforms in which users can upload photos and videos and interact with other users, including anonymously.

Between 2018 and 2024, FLORENCE engaged in approximately 1100 Google searches with Victim 6's name and the terms including but not limited to "exposed", "slut", "xxx", and "webwhore".

In addition, between April of 2021 and March of 2022, FLORENCE posted at least twelve separate advertisements on Craigslist for Victim 6's underwear, which referenced Victim 6 and links to photos of her on the free image hosting website, imgur.com. During the execution of the search warrant at FLORENCE's residence, agents recovered underwear belonging to Victim 6. Images of this underwear were also located by agents during a forensic review of FLORENCE's Pixel 6 Pro phone.

During a forensic review of FLORENCE's devices, agents located numerous images and videos of Victim 6 performing sexual acts with filenames like "[Victim 6] Spitroast", "[Victim 6] fucked", and " [Victim 6] The Slut" on FLORENCE's desktop computer. These images and videos were consistent with the ones filmed and uploaded without Victim 6's knowledge or permission by FLORENCE. Agents also recovered digital evidence that FLORENCE was selling or attempting to sell images of Victim 6 in her underwear to others on the internet for money; again, without the knowledge or permission of Victim 6.

VICTIM 7

In December of 2021, when Victim 7 was 17 years old, FLORENCE, who was in his thirties at that time and had known Victim 7 since she was seven years old, began contacting her over

Instagram using an account with a false name. This account, which was controlled by FLORENCE, professed feelings for Victim 7 in an attempt to develop an intimate relationship with her. While the statements made by this account were not explicit in nature, FLORENCE told Victim 7 the city where she lived and indicated he was "nearby". The statements made Victim 7 very uncomfortable, and she blocked the accounts.

Between May 2021 and August 2023, FLORENCE contacted Victim 7 approximately four times over Facebook Messenger using a fictitious name and profile photo. On August 31, 2023, FLORENCE, using this account, sent Victim 7 a drooling emoji and the messages "you have really cute panties and bras [Victim 7 name]" and "that purple gstring with the matching bra is my favorite".

In May of 2024, FLORENCE posted a photo of Victim 7's underwear on Instagram using an account purportedly in her name. The posting of her underwear and socks included the caption "Quite The Collection Don't You Think" and tagged Victim 7's true Instagram account. Victim 7 realized that the photo contained underwear and socks of hers that were missing. Victim 7 described being so disturbed by the Instagram posts of her underwear that she was scared walking home from work at night and wondered "Who's watching me?".

In total, FLORENCE created at least four Instagram accounts used to harass Victim 7, three of which used Victim 7's name and/or usernames similar to Victim 7's true usernames.

During the execution of the search warrant at FLORENCE's residence, agents recovered underwear belonging to Victim 7. The underwear and socks located by agents matched the underwear and socks in images posted on Instagram by FLORENCE. Agents also identified at least one photo of Victim 7 in FLORENCE's mobile device from when she was approximately 12 years old.

*See* Government's Sentencing Exhibits A and D.

CHILD PORNOGRPAHY OFFENSE

FBI agents also recovered 62 images and 4 videos of child pornography in a folder labeled "FF Models Sandra" in one of FLORENCE's external hard drives. The images and videos depicted females between the ages of approximately six and fourteen years of age masturbating or posed in a sexualized or obscene manner; focused on the genitals.

This child pornography material had been maintained in a hidden folder that included adult pornographic material in file folders, which included titles like, "Anal", "Blame It, Don't Tell, & Whose Your Daddy", "Brutal Blowjobs", "Cum Swap Sluts", and "Teachers, Student, and Babysitters", among other provocative names.



*See* Government's Sentencing Exhibit C.

The following is a description of a sample of three of the child pornography files that FBI agents recovered from FLORENCE's external hard drive.

• IMAGE titled "Sandra-mix-52.jpg". The image depicts a prepubescent female child who, based on the lack of pubic hair, body size, and facial features, appears to be between approximately six and ten years old. The child is naked laying on her back on a bed, exposing her

breasts and vagina. The focal point of the image is the child's genitals.

• IMAGE titled "1111274542.jpg". The image depicts a prepubescent female child who, based on the lack of pubic hair, body size, and facial features, appears to be between approximately seven and ten years old. The child is only wearing a shiny blue triangle bikini top. The rest of her body is exposed, including her vagina. The child is laying on her back on a bedspread with a blue backdrop visible in the background. The focal point of the image is the child's genitals.

• VIDEO titled "wc00024.avi". The video's duration is 17:38 in length. The video depicts a pubescent female child who, based on her lack of pubic hair, slight breast development, lack of hip development, and small body size, appears to be between approximately twelve and fourteen years old. The video depicts the child in various stages of undress, ultimately featuring the child completely naked, exposing her breasts and vagina. The video depicts the child masturbating manually and with a brush handle during various stages of undress, including fully naked.

<u>ADDITIONAL VICTIM'S OF UNCHARGED CONDUCT</u>

FBI agents also identified that FLORENCE began engaging in cyberstalking as early as 2008. The continuation and evolution of FLORENCE's abusive conduct lasted for more than 15 years and included numerous victims.  In total, FBI agents are aware of approximately eighteen potential victims of FLORENCE's online criminal conduct.  FBI agents identified that of those victims, approximately ten women that FLORENCE engaged in a pattern of cyberstalking against, he knew and began interacting with, starting when they were minors.

FBI agents identified seven additional victims who were willing to come forward but for which the period of offense began outside of the statute of limitations and appears did not  continue into the statutory limits for charging.  These additional victims do not include other individuals who were victimized but who did not want to come forward.

VICTIM 8

FBI agent developed evidence demonstrating that FLORENCE continued in a similar pattern of cyberstalking against Victim 8 as the other charged victims in this case. The following is a sample of the conduct involving Victim 8:

Fake dating profile created with digitally altered images of Victim 8 seminude; profile included the text, "I'm really good at: 'Stick around and find out :)'" and "I could never do without: 'Sex ;)'". Ladies.exposed uploads with captions "Slut [Victim 8] Risked", "Slutty [Victim 8] Risk", "[Victim 8]'s Ass Risked", "[Victim 8] Risking Her Tits". Posts on an anonymous forum that said, "Feel free to use my slut, cum all over her pics, and tell me what you'd like to do with her."

During a forensic review of FLORENCE's devices, agents located numerous images and videos on FLORENCE's hard drive depicting Victim 8 participating in sexual acts with filenames like such as "Slut GF [Victim 8] Gets Fucked #1", "Slut GF [Victim 8]  Gets Fucked #3", "Slut GF [Victim 8] Fucked #4", "Slut GF [Victim 8] Gets Fucked #5", "Slut GF [Victim 8] #6", "My girlfriend [Victim 8] getting fucked hard #1".  These filenames are consistent with URLS visited on various pornography websites that contained variations of slut_gf_ [Victim 8] _gets_fucked_hard. FLORENCE had approximately 60 Google searches between 2017 and 2024 with her name, including slut gf [Victim 8]", "[Victim 8] & her panties", "slut gf [Victim 8] fucked".

VICTIM 9

FBI agents developed evidence demonstrating that FLORENCE continued in a similar pattern of cyberstalking against Victim 9 as the other charged victims in this case. The following is a sample of the conduct involving Victim 9:

Photos of Victim 9 stolen from her laptop, including topless photos of her were found on one of FLORENCE's hard drives. Photos of Victim 9, including topless photos and photos of her in underwear, were posted to various online platforms, including two accounts in her name that

purported to actually be her but were in fact not.  These accounts engaged with other users about the aforementioned photo content being posted.

As a result, Victim 9 stopped checking for photos of herself online for her own mental well-being and given her job at the time working with kids, she worried about her reputation for years afterward.  Furthermore, Victim 9 felt violated and recalled the time as "traumatic".  She felt there was nothing she could do despite it "destroying [her] life".  As a result, Victim 9 had anxiety and depression from the experience.

Underwear belonging to Victim 9 was found at FLORENCE's residence during search of his residence.  In addition, several surreptitious videos of Victim 9, which were located on one of FLORENCE's hard drives.

VICTIM 10

FBI agents developed evidence demonstrating that FLORENCE continued in a similar pattern of cyberstalking against Victim 10 as the other charged victims in this case.  The following is a sample of the conduct involving Victim 10:

Victim 10's America Online Instant Messenger account was compromised, and provocative statements were posted; others attributed those posts to her.  Dating profile(s) were created in Victim 10's name and included fake photos of her with her actual biographical information.  As a result, Victim 10 received calls from men claiming to have talked to her on an adult dating and hookup website.  Victim 10 was approached at work by a man who passed her a note saying he enjoyed talking to her on an adult dating and hookup website.  Victim 10 stated that she felt like she was going to be sick after the incident.

During a forensic review of FLORENCE's devices, agents located several digitally altered photos of Victim 10 nude, semi-nude, or engaging in a sex act.  Agents also located a website banner, which read "Expose[Victim 10]" and a text file with passwords for unknown accounts attributed to

Victim 10 on FLORENCE's desktop.  FLORENCE also had notifications set up to notify him of any biographical changes associated with Victim 10 on a data aggregating website.

VICTIM 11

FBI agents developed evidence demonstrating that FLORENCE continued in a similar pattern of cyberstalking against Victim 11 as the other charged victims in this case.  The following is a sample of the conduct involving Victim 11:

Victim 11's America Online Instant Messenger account was compromised; during that compromise Victim 11 was impersonated on this account and three photoshopped images of Victim 11 semi-nude and in provocative positions were sent to an unknown male online.  About a year later, a dating profile surfaced in Victim 11's name with an image of her.

During a forensic review of FLORENCE's devices, agents located several digitally altered photos of Victim 11 almost identical to the photos sent to the man over America Online Instant Messenger.

Victim 11 was "always looking over [her] shoulder", she was worried because she did not know what else was out there.  She felt the person knew her and wondered if they would escalate to physical harm.  The emotional effects have remained with Victim 11 for over ten years – "it never leaves your head" and "that's a tough way to live for over a decade".

VICTIM 12

FBI agents developed evidence demonstrating that FLORENCE continued in a similar pattern of cyberstalking against Victim 12 as the other charged victims in this case.  The following is a sample of the conduct involving Victim 12:

FLORENCE posted at least one image of Victim 12 on an anonymous exposure forum and a semi-nude photo of Victim 12 was found on FLORENCE's desktop computer. In addition, FLORENCE created an impersonation OkCupid profile of Victim 12.

22

VICTIM 13

FBI agents developed evidence demonstrating that FLORENCE continued in a similar pattern of cyberstalking against Victim 13 as the other charged victims in this case.  The following is a sample of the conduct involving Victim 13:

FLORENCE created a dating profile using Victim 13's identifiers.  In addition, FLORENCE created two Instagram accounts with usernames "sugarbaby[Victim 13]" and "[Victim 13]sgb".

Agents located a website banner, which read "Xpose[Victim 13]WithMe", a photo of Victim 13 with a text overlay that included her name, personal information, and the message "PM to see her exposed and to help expose her further!", and a password associated with her in a text file on FLORENCE's desktop.  Agents also identified two images of Victim 13' in underwear on FLORENCE's Pixel 6 Pro that Victim 13 told agents she had considered using for a "sugardaddy" website, however, she never sent the photos to anyone or posted them anywhere.

VICTIM 14

FBI agents developed evidence demonstrating that FLORENCE continued in a similar pattern of cyberstalking against Victim 14 as the other charged victims in this case.  The following is a sample of the conduct involving Victim 14:

FLORENCE uploaded at least one photo to ladies.exposed "[Victim 14] Risk" and FLORENCE created an account on Chat Ave (chatroom for adults) with username "exposemygf[Victim 14]".

Agents identified a photo of Victim 14 split screen with Victim 6 with their names and text that included "2 UNAWARE SLUTS FOR YOU/PICK ONE OR BOTH/MAKE THEM FAMOUS CHATPIC WHORES" on FLORENCE's desktop. Agents also found passwords associated with Victim 14 in a text file on FLORENCE's desktop.

EXAMPLES OF FLORENCE's ABUSE TOWARD VICTIMS 1 – 14





```
From: Ur Mom <orinkade1612@gmail.com>
Date: Fri, 5 May 2023 14:42:26 -0400
Message-ID: <CAHcftbO+dioA5uMZNQnRh-zmk52vc69r5Cu=ft=4UBsm25GTKQ@mail.gmail.com>
Subject: Exposed slut!!!!!
To:            @yahoo.com
Content-Type: multipart/mixed; boundary="00000000000038537e05faf6a7f5"
Content-Length: 1670467

--00000000000038537e05faf6a7f5
Content-Type: multipart/alternative; boundary="00000000000038537c05faf6a7f3"

--00000000000038537c05faf6a7f3
Content-Type: text/plain; charset="UTF-8"

Such a famous webslut loll, you must do as I say and as quick as possible
or everyone you work with is going to learn about you. 1st I want a tits
and ass pic. 2nd a video of you fingering yourself. If you don't I got an
email ready for coworkers. Can't wait!
```















*See also* Government's Sentencing Exhibits A and D.

### III. SENTENCING GUIDELINE CALCULATIONS & ENHANCEMENTS

i.    **Legal Framework**

The United States Sentencing Guidelines ("Guidelines") are "the starting point and the initial benchmark" in sentencing. <u>Gall v. United States</u>, 552 U.S. 38, 49-50 (2007). Following the Supreme Court's decision in <u>Gall v. United States</u>, "District Court judges can choose sentences that differ from the Sentencing Commission's recommendations—provided of course that they stay within the range set by the statutes of conviction and consider the sentencing factors arrayed in § 3553(a)." *See e.g.*, <u>Gall</u>, 552 U.S. at 41, 49–50 & n. 6. While <u>Gall</u> made the Guidelines advisory, "[t]his is not a blank check for arbitrary sentencing." *Id.* "Judges *still* must start out by calculating the proper Guidelines range—a step so critical that a calculation error will usually require resentencing." *Id.* "The reason for this is simple. Congress wants judges to do their best to sentence similar defendants

28

similarly." *See* <u>Booker</u>, 543 U.S. at 250–54, 259–60. "And starting with the Guidelines' framework—which gives judges an idea of the sentences imposed on equivalent offenders elsewhere—helps promote uniformity and fairness." *See* <u>Gall</u>, 552 U.S. at 49; <u>Booker</u>, 543 U.S. at 245–60.

After consulting the Guidelines, the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553 (a). *See* <u>Gall</u>, 552 U.S. at 50. In doing so, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See* <u>18 U.S.C. § 3553 (a)</u>. The Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant; must impose a sentence that sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just punishment, and the sentence should adequately deter criminal conduct, protect the public, and provide any necessary education, training or treatment. *See* <u>18 U.S.C. §§ 3553 (a) (2) (A)-(D)</u>. The Court must also strive to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* <u>18 U.S.C. § 3553 (a) (6)</u>. After determining the appropriate sentence, the Court should adequately explain its rationale to "allow for meaningful appellate review and to promote the perception of fair sentencing." *See* <u>Gall</u>, 552 U.S. at 50. [1]

"Variances are 'non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553 (a),' while departures are a term of art referring to non-Guidelines sentences authorized and 'imposed under the framework set out in the Guidelines.'" *See* <u>United States v. Tirado-Nieves</u>, 982 F.3d 1 (1st Cir. 2020) (quoting <u>Irizarry</u>, 553

---

[1] "In reviewing a sentence for reasonableness, the Court of Appeals first examine whether, in arriving at sentence, the district court committed any procedural errors, such as failing to calculate, or improperly calculating, the advisory Guidelines range, treating the Guidelines as mandatory, failing to consider the statutory sentencing factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence, including any deviation from the Guidelines range" *See* <u>United States v. Contreras-Delgado</u>, 913 F.3d 232 (1st Cir. 2019).

U.S. at 714); <u>United States v. Adorno-Molina</u>, 774 F.3d 116 (1st Cir. 2014). After the guideline range is determined, the court may "depart" from the guideline range where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." *See* <u>Pepper v. United States</u>, 562 U.S. 476, 494 (2011). "If the court departs from the applicable guideline range, it shall state, its specific reasons for departure in open court at the time of sentencing and…shall state those reasons with specificity in the statement of reasons form." *See* <u>18 U.S.C. § 3553 (c)</u>.

### ii.    The U.S.S.G. Calculations

On April 17, 2025, the United States District Court (Stearns, J.) accepted the defendant's waiver of indictment and his change of plea to an Information, charging FLORENCE with seven counts of cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). *See* ECF Nos. 38, 39, and 40.

FLORENCE faces the following maximum penalties on Counts One through Seven of the Information: a sentence of up to 5 years of incarceration; supervised release for three years; a fine of $250,000; and a mandatory special assessment of $100, on each of these Counts. FLORENCE faces the following maximum penalties on Count Eight of the Information: a sentence of up to 20 years of incarceration; supervised release of five years to life; a fine of $250,000; a mandatory special assessment of $100; a discretionary special assessment under 18 U.S.C. § 3014 of $5,000; and a discretionary special assessment under 18 U.S.C. § 2259A for distribution/possession of $17,000. *See* cover sheet of PSR, and ¶¶ 186, 189 – 191, 195 – 198, and 18 U.S.C. § 3583(k).

A final Presentence Report ("PSR") was issued by U.S. Probation on July 15, 2025. The PSR determined the total offense level to be 31, after including all relevant sentencing enhancements and after granting a three-level reduction for acceptance of responsibility. *See* PSR ¶¶ 77 – 138. Based upon a Total Offense Level of 31 and a criminal history category ("CHC") of I, the PSR

calculated the advisory guidelines sentencing range ("GSR") to be 108-135 months. *See* PSR ¶ 187 and pg. 34.[2]

The guidelines calculated in the agreement of the parties is based on a Total Offense Level of 29 and a CHC of I, which provides for GSR range of 87 – 108 months of incarceration. The government notes that the calculation performed by U.S. Probation in the PSR and the one in the agreement between the parties are substantially similar to one another in the overwhelming majority of the calculations. The only discrepancy between the calculations is with the two additional adjustments related to the cyberstalking counts and the one additional adjustment related to the child pornography count in the PSR. *See* PSR ¶ 3.

Importantly, both guideline's calculations result in a recommended sentencing range that intersects here at the government's proposed sentencing recommendation of 108 months of incarceration. The government would suggest the irrespective of the Court's ultimate determination of the final guidelines in this case – the proposed sentence of 108 months of incarceration is appropriate.

### iii.     Legal Context

Defendant's criminal actions of engaging in this more than a decade long criminal enterprise to debase and destroy the lives of more than a dozen woman was made all the more terrifying through his use and exploitation of the advent of modern technology. That technology  a double-edged sword - shielding him in the cloak of its' anonymity and weaponizing its' profound size, scope, and power,

---

[2] The government notes that the final PSR – guideline analysis, which utilized the 2024 Guidelines, stands in contrast to the guidelines as initially calculated and agreed to by the government in the parties' plea agreement, which arrived at a Total Offense Level of 29.  The government however does not dispute the accuracy of U.S. Probation's calculations – nevertheless the government's ultimate sentencing recommendation based on the guidelines in the parties' plea agreement still stands regardless, as the appropriate recommended disposition in this case.

so that he could wield these cutting-edge advances in technology to effect great cruelty on his victims for his own self-satisfaction. FLORENCE harnessed the enormous might of our world's newest technology; generative AI and other machine learning tools, which are just getting some definition in our society. And FLORENCE harnessed this enormous might – not to advance our world or our society for the betterment of its' citizens but rather to compensate for his own insecurity, fragile masculinity, and to fill some sense of deficiency for a toxic notion of power and control. He has demonstrated a complete disregard for the welfare of his victims.

On an alarmingly similar case out of this very District, Judge William G. Young, emphatically expressed the horrific consequences of similar behavior in a case in which the defendant also demonstrated intense and prolonged cyberstalking against numerous victims and possessed/distributed child pornography. In <u>United States v. Ryan S. Lin</u>, 18 – CR – 10092 – WGY, ECF No. 40-1, 3 (D. Mass 2018)  the Court noted:

> This conduct is monstrous. We live in a community. Reading this entire record, listening to the victims, listening to the Assistant United States Attorneys, listening to your counsel, who's done a superb job on your behalf, not the least in the negotiation of this plea agreement, he's right to point out that all of these crimes were committed with you sitting behind a computer. That point is well-taken. Yet in today's world, that does not diminish the crimes in any way. In fact it ought to bring home to all of us how interconnected we are and what havoc can be wreaked by the improper evil criminal conduct in which you so gleefully engaged. I'll grant you that you may not have fully appreciated the harm you did to your specific victims and to the community as a whole. In the eyes of this Court, that does not diminish from the sentence which ought be imposed.

Cyberstalking is a serious offense that has profound consequences for victims and for the public alike. It is an offense that is about power and control, it disproportionately harms and affects women, and typically occurs within the context of intimate partner or domestic violence. *See:* <u>Malta-Espinoza v. Gonzales</u>, 478 F.3d 1080, 1086 (9th Cir. 2007) (Duffy, J., dissenting) ("The stalker often

seeks a sense of power or control over his victim, usually through fear.")[3]

Nevertheless, here the defendant's criminal conduct – his predatory predations extended from cyberstalking into the possession of child exploitation material, also referred to as child pornography. In fact, many of the defendant's Victims stated they first encountered abuse at the hands of the defendant, when they were minors. Numerous courts have emphatically expressed the wretched consequences of child pornography. In <u>United States v. Goff</u>, 501 F.3d 250, 258-59 (3rd Cir. 2007), the Court noted:

> Children are exploited, molested, and raped for the prurient pleasure of [the defendant] and others who support suppliers of child pornography. These small victims may rank as 'no one else' in [the defendant's] mind, but they do indeed exist outside his mind. Their injuries and the taking of their innocence are far too real. There is nothing 'casual' or theoretical about the scars they will bear from being abused for [the defendant's] advantage.

"It is an unassailable proposition that '[c]hild pornography harms and debases the most defenseless of our citizens.'" *See* <u>United States v. Grober</u>, 624 F.3d 592 (3rd Cir. 2010), citing <u>United States v. Williams</u>, 553 U.S. 285, 307 (2008). In <u>United States v. Cunningham</u>, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), the District Court reasoned:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul. Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their

---

[3] *See*, e.g., U.S. Department of Justice, Office on Violence Against Women, 2014 Report to Congress at 2 (January 2017), available at https://www.justice.gov/ovw/page/file/932736/download (last visited November 14, 2018) (hereinafter "DOJ, Report to Congress") (noting that 1 in 7 U.S. women and 1 in 19 U.S. men have experienced stalking in their lifetimes, and the most common relationship between victim and stalking perpetrator is that of current or former intimate partner).

33

actions were discovered by law enforcement.

Additionally, Congress has repeatedly recognized that recidivism rates are particularly high for sex offenders.[4]  Courts have recognized this as well.  The Eleventh Circuit has noted that "child sex offenders have appalling rates of recidivism and their crimes are under-reported."  United States v. Pugh, 515 F.3d 1179, 1201 (11th Cir. 2008); United States v. Allison, 447 F.3d 402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.)

Cyberstalking is also not surprisingly a crime, which is frequently under explored because investigators are under resourced in this area and often unclear on how to solve for the investigative complexities; this can too often leave victims with a feeling of helplessness and ultimately hopelessness. Despite the harms caused by stalking to both individual victims and to the public, stalking is an offense that has historically remained underreported and under-prosecuted.[5] Such underreporting is a result of, among other things, inadequate protections for stalking victims, a belief that the police cannot or will not do anything, fear that victims will not be believed, fear of the perpetrator, not having proof of the stalking, and fearing that the crime will not be taken seriously.[6]

iv.      **Discussion of 18 U.S.C. § 3553 factors**

The government's recommendation accounts for the factors that the Court must consider outlined in 18 U.S.C. § 3553(a).  The factors include, but are not limited to, the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the

---

[4] *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling Congressional statements regarding the high risk of recidivism among child sex offenders).

[5] DOJ, Report to Congress at 5-6 (noting that the rates of reporting for stalking crimes are anywhere between 17 and 41 percent).

[6] *See, e.g.*, DOJ, Report to Congress at 5.

offense, promoting respect for the law, providing just punishment for the offense, the need to deter the defendant and others, the need to protect the public from the defendant's crime, and the need to avoid unwarranted sentencing disparities.

For the reasons outlined in the government's filings, and those to be articulated at the sentencing hearing, the government submits that its recommended sentence is reasonable and necessary in this case to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and others from offending in the same ways again, and to protect the public. The government understands that the defendant's Guidelines are relatively significant here as compared to the ranges for many other crimes that are prosecuted in federal court. That distinction is not without reason: both Congress, in setting the maximum sentence, applicable to the defendant's offense of conviction; along with the Sentencing Commission, which develops the Guidelines and the specific offense characteristics applicable, clearly recognize in a situation like this one that individuals who prey on those who are vulnerable in their lives and in our society merit truly significant punishment that is commensurate with the harm they cause and the danger they pose.

In this case, the government is asking the Court to impose a sentence of incarceration of nine years, 108 months on this defendant. The government recognizes that for most people, the prospect of that length of time in prison would be staggering. But so, too, is the defendant's crimes, the seriousness of which is difficult to overstate. This is further put into prospective when understood through the lens of the defendant's Victims, all of whom FLORENCE deemed objects of his cruelty and he imposed his own sentence of trauma and torment, without judge or jury, and for many of his victims - their sentence exceeded the nine years that the government is asking the Court to impose.

v.    **The Nature and Circumstances of the Offense**

The government urges the Court to consider the nature and circumstances of the offense, to recognize the extreme seriousness of his crimes, to assess these crimes for what they are, and for

the enormous impact they have had on so many victims, on their families, and their friends. *See* 18 U.S.C. § 3553(a)(1). The facts were outlined at the Rule 11 and are additionally outlined in detail in the PSR. *See* PSR ¶¶ 7 – 71 and 139 – 149.

The government's recommended sentence is appropriate for several reasons. First, the defendant's conduct was particularly vile and will continue to impact the victims for many years to come. The defendant used generative AI and other tools of machine learning to create images depicting victims in a sexualized manner, which resulted in dire consequences for the women involved, not just personally but professionally; and it continues to levy untold damage both emotional and tangible on these victims to this day. The defendant then posted these images on pornography and expose/shame websites accessible to the entire world and encouraged others on those dark corners of the internet to "own" the victims. Worse still the defendant secretly recorded more than one Victim without her knowledge, and for one Victim those secret recordings occurred during some of the most intimate acts imaginable, created during his relationship with that Victim. He then horrifically posted that content on pornography and expose/shame websites, which are visible to the entire world. To make matters worse, the defendant added the Victims' names, addresses, and other identifying information to the content he generated and posted online.

It is hard to imagine an avenue in which the defendant didn't choose to violate, traumatize, or torture his Victims. He shattered every aspect of and norm in their lives, exercising power and control over them for over a decade; a level of obsession that can only truly be categorized as dangerous. The fact the defendant had a photograph of Victim 1 printed on a phone case in his home, which was located during the search warrant of his residence, among dozens of stolen underwear of his Victims, speaks volumes about this dangerous obsession. The consequences of all of this are that the Victims have suffered substantial emotional distress as a result of this long-term pattern of cyberstalking, which has targeted them for years and in many cases the majority, if not the entirety

36

of their adult lives.

Victims and their loved ones received texts, calls, and emails directly harassing them or notifying them of new accounts or platforms displaying their images and information. The Victims' names, images, and information were posted on dozens of websites by dozens of unique accounts. Their most private information put out there for the world to see. The most intimate of images of them on display, and worse almost every one of these images were generated by the defendant to inflict harm.

Despite their best efforts, the Victims have worked to delete numerous email accounts and social media accounts, including accounts going back to when some of them were teenagers. The Victims have changed email accounts, online usernames, and phone numbers; replaced phones, ceased professional and public engagements, shut down their side businesses, and one Victim even obtained a new driver's license.

Many of the Victims spent countless hours attempting in vain to continuously report impersonation accounts and posts of their images and information to online service providers and website administrators in an attempt to get them removed. In addition, one of the Victims has paid for subscriptions to services that continuously scan the internet for a subscriber's personal information and remove it.

The Victims and their families feel physically unsafe; they worry that a perpetrator or those viewing these posts will show up to their homes. The defendant provided sexually suggestive content in the same posts as directions to one of the Victim's homes. The defendant even posted photos of that Victim's home online. This Victim had to install surveillance cameras, both external and internal cameras, in her home and she went so far as to place sleigh bells on the inside door handles of her home to alert her of any movement. All the Victims have described feeling on edge, and for the Victim whose home was the focus of the defendant's monstrous actions – that feeling occurs every

37

time an unknown vehicle turns down her street.

The facts are egregious and merit a very lengthy prison sentence. Why is the government's recommended sentence of 108 months appropriate? The government would direct the Court to the heart of their sentencing argument: the incredible women in this case who tragically found themselves the victims of the defendant's abhorrent behavior - who have demonstrated remarkable courage and strength of character in the wake of his crimes. It is their amazing words the government hopes the Court will consider most when arriving at a determination of sentence. *See* Government's Sentencing Exhibit B and Addendums to the PSR.

The devastating conduct of the defendant in this case – the true nature and circumstances of the offense are encapsulated by the Victims in their impact statements, including by Victim 1, who wrote, in part:

> …he subjected me to a relentless and escalating campaign of targeted harassment. His anonymous attacks spiraled into a near-daily assault, with each act becoming more invasive and aggressive as time went on. Over the course of those years a stranger was impersonating me online, creating fake images and AI chatbots in my likeness, attempting to extort me, sharing my phone numbers and email addresses, my home address and place of work, and inviting other criminals online to attack me as well. Friends, family, and even my students and colleagues were exposed to the disgusting content that he created.

The irreversible damage and loss of time for these Victims – who can never get back what the defendant took from them and in several instances because the defendant sexualized some of the Victims from an early age – he took away a childhood that they never got to have as well. This is something captured in the impact statement of Victim 3, who wrote, in part:

> Despite my initial efforts to develop into the person I wanted to be, this was the same time when Jimmy decided to create the narrative of I who I was – taking over my accounts, impersonating me, and photoshopping my teen face on half-naked and fully nude bodies. He put me on websites with the word "Jail Bait" included in it, while posting my personal information, making anonymous figures accessing this website aware of a teenage girl's home address…. I had

38

no desire to ever be sexualized in my youth. Where most teenagers count down the days until they become an adult, I was begging to just be a kid again.

The loss for the Victims in this case extended to a multitude of facets of their lives - each stemming out of the defendant's conduct here, which included not just his objectification and sexualization of them, but also their commodification to others. The defendant actions attempted to destroy the Victims in this case - robbing them of their innocence by not just presenting these distorted and harmful characterizations of them to the world, but by also inviting the world to be his accomplice in his torment of these Victims.  Victims 8 and 10 in their impact statements speak to this terrifying aspect of the defendant's crimes and the resulting consequences for them.

Victim 8, wrote in part:

> I was approached multiples times, by multiple men asking me about accounts I did not create and conversation I did not have. The man from the video came up to me at a restaurant asking me if I enjoyed our chat, which I had no idea what he was talking about. I have had men that I knew when I was younger physically approach me, one time at a family event, who believed he had met me on a dating app, Plenty of Fish, asking me to go on a date because he "enjoyed our chats". When I asked him what he was talking about, he showed me a profile of me which included pictures of me half naked, some AI generated and some he stole from my accounts, with a bio titled "Mom out to have fun".

Victim 10, wrote in part:

> The guy I was dating at the time had a friend who found me on a dating website next. Since it definitely wasn't me, I started investigating on my own. I found if you googled my name, so many profiles would pop up with my actual information on them, but with doctored photos of me… in the nude! I started to hear from strangers and old friends who thought they were talking to me on these websites. They were upset we stopped "talking" because they were guaranteed to get laid in 3-5 days or they'd get their money back. This is when I knew something was seriously wrong.

The defendant's crimes were "seriously wrong" and belay a manipulative predator, one who

not only preyed on the women in his life but also preyed on the most vulnerable of victims, victims of child sexual exploitation. The defendant perpetuated the cyclical and never-ending trauma of those children by continuing to perpetuate their abuse in his collection of their child sexual abuse images and videos. The government would note that the hard drive that the child sexual abuse material was found on was not merely deleted and forgotten about as the defendant contends in his objections to the PSR, but rather the government would suggest that his maintenance of his child pornography collection was part of the defendant's overall operational cyber security and a deliberate act to secret the illegal child pornography from accidental discovery. These child sexual abuse images were maintained initially as part of the same series of "hidden" folders, which had titles like, "Anal", "Blame It, Don't Tell, & Whose Your Daddy", "Brutal Blowjobs", "Cum Swap Sluts", and "Teachers, Student, and Babysitters", among other provocative names. Those child pornography files, while marked as deleted, were still very much accessible on the drive as demonstrated by agents during their forensic review. *See* Government's Sentencing Exhibit C.

In addition, agents took more than a dozen digital devices from the defendant's home during the search warrant of his residence – the majority of which remain encrypted to this day. The extent of his collection and his overall crimes cannot truly be known to the government and provided to the Court because all of the defendant's most contemporary devices are those that remain encrypted today. Furthermore, the defendant's interest in child sexual abuse material is supported by several of his Victims who, in their impact letters addressed to this Court, discuss the defendant "grooming" them; often beginning his inappropriate and abusive behavior when they were in their early teens.

Victims 3 and 6 in their impact statements speak to this facet of defendant's predatory behavior and crimes.

Victim 3, wrote in part:

> I was 13, he was 19. At 14 and 20, he would chase me around the house

and hug me tightly while we were alone in the basement. Social media had made this inappropriate behavior escalate. In the beginning of 2009, when I had just turned 15, I would receive anonymous messages on MySpace from someone that was professing their "feelings" for me through two different methods. One confession was through an anonymous platform called "Truth Box," while the other method was via a MySpace account dedicated to me with several of my pictures on it as early as age 13. This account told me that they would remain anonymous because they knew my family wouldn't approve of our "relationship". I knew in that moment who I was talking to. I blocked the account and removed his real account before finally blocking it after he personally tried to contact me one more time. The events onward became darker. At 15 years old, I was a young girl who was not only being sexually harassed by Jimmy, I was also dealing with sexual trauma from deeper in childhood.

Victim 6, wrote in part:

I was 15 years old when I met James online and he was 20 years old. Before this, I never would have said I was "groomed" by him. But now, with the benefit of hindsight- I can say I was groomed. He gave me a cellphone and offered to pay for it when I didn't have one, he gave me access to things that I never would've had without him, such as letting me drive his car- he knew everything that my 15-year-old self wanted to hear. Looking at this now this was all bait to get me to trust him.

Given the facts of this case, the defendant's the prolonged and relentless conduct, which largely revolved around sexual shame and exposure of the Victims, combined with what appears to be substantially more than a casual sexual interest in minors – the sentence requested by the government of 108 months is necessary and appropriate.  In examining the seriousness of the offenses, the Court must review the harm to the Victims.  *See* <u>United States v. Cunningham</u>, 680 F. Supp 2d at 844, 855 (N.D. Ohio, 2010).  The Victims will now have to worry for the rest of their lives about the images and videos posted by the defendant; are they out there being traded and used for gratification by others like the defendant. Each time a sexually explicit image or video of a  child or and adult victim is viewed, accessed, possessed, received, sent, or produced, that victim is being re-victimized.

### vi.        History and Characteristics of the Defendant

FLORENCE's history and characteristics also weigh in favor of a longer incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1). The defendant has had more advantages than most defendants who appear before this Court. He attended Full Sail University and was gainful employed in jobs making close to six figure salaries for more than ten years. PSR ¶¶ 176, 180, & 181. He has a loving, supportive family, including two parents that by his own statements, he maintains a close relationship with to this day. PSR ¶ 160. Unlike many of the defendants who appear before this Court, FLORENCE has not struggled with poverty, addiction, or a lack of opportunity.

In his presentence interview with Probation, the defendant related he has no history of any mental health diagnoses, nor has he previously sought treatment for the same, but he expressed some interest in future mental health treatment. *See* PSR ¶ 173. Per the defendant, he does not have an issue with drugs or alcohol, nor does he believe he needs treatment. *See* PSR ¶ 175. To be clear, were the defendant to have any of these challenges, it would not excuse his criminal behavior, however these factors sometimes provide context for criminal conduct. That is not the case here. There are no mitigating factors in this case, and the defendant should be sentenced accordingly.

Certainly, at a surface level the defendant appears to have lived a regular life amongst his family away from his online presence and his secret predatory conduct. It is apparent from his family's view of the defendant that he is "extremely remorseful", has never "made an excuse for his behavior", "was relieved when he was arrested", and generally despite life's challenges – particularly in his challenges in his intimate relationships with women ,it was always the woman's fault - they had issues, and they were "unfaithful". *See* PSR ¶¶ 158 - 168. This is somewhat disingenuous as the defendant was victimizing these same women from the start of his relationship with them. And his remorse and relief at finally being held responsible seems to be at odds with what we now know from one of the Victims who was still in a relationship with the defendant for the better part of his

detention on this case.

Victim 14 in her impact statement, wrote in part:

> I write to you in fear, sadness, and anger. Fear because despite being arrested and incarcerated, James Florence continued to call me and spin lie after lie about why he was there. Up until the day I found the courage to believe the evidence and the victims, and block his number, he maintained a posture of minimizing, lying about, and showing little accountability for the abhorrent things he has done. Sadness, because I was not a passing acquaintance or friend. I was someone who he looked in the eye and said 'I love you' to. I trusted him during emotionally and sexually vulnerable times... and he sold and traded me on the internet. And Anger, if for no other reason than I have worked my entire life to be a good person. A Daughter, a sister, a mother, a friend... and instead James told the internet to 'make me famous' as an 'unaware whore' and 'chatpic slut'.

And

> He has written to me while in prison. Seeking comfort while he is displaced and scared. Comfort that he relished in stealing from unknowing girls and women. The security and privacy of our identity. Agency over our own bodies. Our physical and sexual safety. He spent hours painstakingly instilling fear into their lives and hiding in the shadows; and now he wishes for mercy.

The defendant's behavior in this case and in his interactions with these Victims, which is supported by agents' observations during their digital forensics of his devices and online accounts, paints a stark contrast to the image he presents of his home life and that his family presents to U.S. Probation of him. All these points illustrate that this defendant knew exactly what he was doing when he intentionally and knowingly spent more than a decade exploiting and tormenting the Victims in this case. Furthermore, it seems that when he revictimized those children captured in his collection of sexual abuse material, he was willing to "own" them as sexual objects without thought to their trauma and victimization.

> **vii.**    **The Requested Sentence Is Needed to Promote Respect for the Law, Afford Specific and General Deterrence, and to Protect the Public from Future Crime(s) of the Defendant**

The seriousness of this crime for which the defendant now stands convicted cannot be treated in a routine manner or without consideration for the long-term destructive impact it continues to have on the Victims.   The defendant has profoundly and negatively affected the lives of all the Victims in this case through his criminal actions.   In examining the seriousness of the offense, the Court must review the harm to the victim.   *See* United States v. Cunningham, 680 F. Supp 2d at 844, 855 (N.D. Ohio, 2010).  The continuing impact that the defendant's crimes have had on his Victims is reflected in their victim impact statements submitted to this court.  *See* Government's Sentencing Exhibit B and Addendum to PSR.

These victims are not abstractions or objects — they are real people who experienced repeated exploitation by the defendant. A significant term of imprisonment reinforces, to the defendant and to others who are tempted to follow in his footsteps, that these crimes are exceedingly grave in nature, it would serve as a deterrent, and it would thus promote respect for the law.

In short, the defendant's actions have caused untold heartache, anxiety, and fear upon the Victims, their families, and those who love and care for them.  It is clear that this defendant has left a stain, one which will negatively affect the lives of his Victims for a considerable time to come, and in too many facets of their lives to count at this point. The government asserts the requested sentence is "sufficient, but not greater than necessary," to account for this conduct and to accomplish the goals of § 3553(a).  *See* 18 U.S.C. § 3553(a).

Imposing serious penalties on this defendant for his sustained, far reaching, and terrifying campaign – one with a lasting impact is necessary and appropriate. He has taken years already from these Victims and for them their trauma will continue to endure. The path to healing for these Victims can't  begin until this defendant is no longer a threat to them or the public. The collective ripple in the pond of this defendant's criminal conduct left not just the Victims in the destructive wake of his

more than a decade long crime, but also collaterally damaged all of those involved in the lives of these Victims, who themselves will also need time to heal.

A sentence of 9 years, while substantial, is nevertheless less than the decade or more of punishment he doled out. This sentence will appropriately serve as both a general and specific deterrent to the future conduct of others who wish to spew toxicity and cowardly torment all the while existing under the comfort of the anonymity provided by modern technology, and the comforts of the online world. It is also required to protect the public from any further crimes from this defendant. *See* 18 U.S.C. § 3553(a)(2)(B) and (C).  "[S]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor."  *Also, see* United States v. Goldberg, 491 F.3d 668, at 672 (7th Cir. 2007)(a sentence affects the life of the criminal and the lives of his victims); *see also* Goff, 501 F.3d at 261 (stating in child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing").

Imposing serious penalties on individuals who actively participate in the monstrous cyberstalking conduct already outlined in this memorandum should be deterred by the sentence of this Court. However, it is equally important that those who participate in and drive the child exploitation market as consumers, should also be deterred too, by a significant penalty for joining these exploitative markets. Furthermore, those who produce this exploitative material should be equally warned in their efforts to meet the demand of consumers like the defendant and others.  The defendant exploited these children behind a veil of technology, no different to his behavior in his other charged conduct here – reducing these exploited children as well to sexualized objects.  Neither these children nor the adult Victims in this case are an abstraction or an object—they are real people who experienced exploitation by this defendant. All the victims in this case child or adult are someone's daughter, granddaughter, niece, family, and friend.  As a community charged with

administering justice, we should keep this at the forefront of any sentencing determination. This can often be accomplished in many forms – here justice is most clearly arrived at, with a prolonged period of Court involvement in the defendant's future years; one which is best garnered with a significant period of incarceration (108 months), and then followed by a substantial period of supervised release (60 months).

The defendant's crimes require this lengthy Court oversight so that the specter of this defendant's menace is removed from our community – so that our community is allowed the time and ability to heal, so that the defendant is held responsible for his reprehensible behavior, and so that the message can be sent to others who are similarly disposed as the defendant, that they should rethink and reevaluate the risk and consequences of carrying out similar conduct, and ultimately to guarantee the protection of the online safety of the public going forward so that we are not doomed to repeat the facts of this case.  So that the bravery of these Victims in the face of their heartache is not in vain.

A significant sentence is appropriate pursuant to 18 U.S.C. § 3553(a)(2)(C) to protect the public from this defendant and his use of technology to turn numerous people's lives upside down. FLORENCE's conduct should cause concern for literally any woman with whom he interacts.  His conduct is frightening and traumatizing, and he should receive a 108-month sentence to afford the Victims the knowledge that he will be unable to harm them for a lengthy period of time and to ensure that even more women are not subjected to the same type of victimization.

**viii.    The Requested Sentence Is Needed to Reflect the Seriousness of the Offense and to Provide Just Punishment for the Offense**

The government would suggest that we cannot look at what occurred in this case and assess its' overall impact in some clinical way, nor can we afford to figuratively look the other way and exclaim that these victims are "someone else's children or family" – or that the courageous words of

the Victims – their pain doesn't require action – instead it demands our action, that we send a message with this sentence, a message about the parameters and norms we set on those who misuse the advances in our technology. A message, which should indicate that this dangerous online behavior, which was exacerbated here through use of generative AI technology; a technology we don't yet have a complete inventory on all of its 'potential applicable uses, good and bad. This technology is not just an academic concept anymore or a distant problem effecting only other unknown people. Rather, the government would suggest that in this case, what is on display for the Court and the public, is just how easily the dark corners and recesses of the internet can be combined with new technologies to become a force multiplier for detestable online conduct and cyber-enabled crime, like that carried out by the defendant.

Here, in this case, it appears that by wielding technology in this way, the defendant, chose to utilize these advancements, not in keeping with their intended design, as a change agent for good, but instead to weaponize them; to increase the havoc he wreaked on the Victims, not just havoc in the online world but also into the physical world, and with chilling indifference.

The government stresses this primarily because while this maybe the first instance confronted in the District of Massachusetts (*and potentially in the federal court system*), of a defendant utilizing with great effect the recent advances in technology (artificial intelligence, machine learning, and large language models), especially for such destructive purposes, it is now clear that he certainly will not be the last! Instead, this defendant's conduct, here in this case, should be viewed by the Court as the proverbial canary in the coil mine – alerting us to a brave new world, one in which evolving technologies designed to make our lives easier, are also being harnessed equally to make the world both online and physical more harmful and dangerous. The sentence imposed here needs to reflect this along with the seriousness of this offense, especially given the context of our current moment.

ix.        **SUPERVISED RELEASE CONDITIONS**

Per the plea agreement, the government recommends a five-year term of supervised release. A lengthy term of supervised release is essential to ensure that the defendant completes the extensive sex offender treatment programing selected by U.S. Probation, any mental health evaluations and counseling as deemed appropriate by U.S. Probation, and that his computer use and access to children are restricted and monitored along with the numerous other special conditions put forth by U.S. Probation.  The government agrees that the defendant cannot possess a computer or internet capable device without prior approval from U.S. Probation, and only then with the installation of monitoring software. The government would ask this Court, as part of this condition for U.S. Probation to notify the government if , and when the defendant is permitted to posses any digital device, so that we may adequately provide notification to the Victims of this change in circumstances.

The government further emphasizes the special condition being recommended by U.S. Probation requiring the defendant have no contact with any of the Victims and their families in this case, be enlarged and clarified to include all Victims identified as part of the PSR and identified in this memorandum and not just those associated with the charged conduct. Finally, the government would ask that the "no contact" extend also to close friends and significant others of all the Victims, as they are also collaterally damaged by the defendant's actions.

The government contends that all the mandatory and special conditions of supervised release as outlined in the PSR are appropriate and justified and should be imposed.  The defendant's term of supervised release is also reasonable, as courts have approved much larger terms of supervised release.  *See, e.g.,* United States v. Allison, 447 F.3d 402 (5th Cir. 2006) (affirming imposition of lifetime supervised release for defendant convicted of possession of child pornography); United States v. Cope, 506 F.3d 908, 916 (9th Cir. 2007) (affirming imposition of lifetime term of supervised release for defendant convicted of possession of child pornography who had a prior conviction for

attempted sexual assault on a child). Additionally, pursuant to the Sex Offender Registration and Notification Act and the laws of the Commonwealth of Massachusetts, Defendant is required to register as a sex offender and to keep that registration current.

**x.    Conclusion**

This defendant knew very well that what he was doing was wrong. The consequences of his conduct are quite foreseeable – and, given the way the defendant manipulated the people around him in his life – the same people he purported to care about during the daylight hours and then treat with incredible cruelty under the cover of darkness, the consequences and impact of his actions should have been more than visible to him. Any assertion that the defendant is a mere opportunist or misguided rather than motivated by deviant sexual predilections and a sadistic and masochistic self -gratification, is also hard to accept and seems scarcely relevant to his culpability. To be clear, the government agrees that his sentence must include a focus on restoration and making amends when he is at the point of transitioning back into society. But the government's recommendation also recognizes the need for a sentence that is long enough to demonstrate that the defendant himself is culpable and that his behavior is not something that society will tolerate. It balances a true assessment of the defendant's willful, uncoerced behavior with the need for deterrence – specific and general – and considers parity with other similarly situated offenders. Some reflection on societal values is warranted and necessary to evaluate the appropriateness of the GSR and fair balancing of 3553(a) factors.

This is not a case that merits the imposition of the minimum possible sentence, even when that sentence is quite high. In other cases, involving cyberstalking by defendants also charged with violations of 18 U.S.C. § 2252A, the government has recommended – and courts have imposed – sentences reflective of the seriousness of such offenses. In <u>United States v. Ryan S. Lin</u>, 18 – CR –

10092 – WGY, ECF No. 40-1 (D. Mass 2018),  the Court noted:

> [Counsel] is right to point out that all of these crimes were committed with you sitting behind a computer. That point is well taken. Yet in today's world, that does not diminish the crimes in any way. In fact it ought to bring home to all of us how interconnected we are and what havoc can be wreaked by the improper evil criminal conduct in which you so gleefully engaged.

*See*, *e.g.*, United States v. Ryan S. Lin, 18 –CR–10092–WGY ( *defendant sentenced to 210 months incarceration for engaging in a cyberstalking campaign for a year against his housemate, hacking online accounts and devices, stealing private photographs and sensitive information, and then distributing the material – the defendant was also charged with child pornography offenses*); United States v. Sayer, 748 F. 3d 425 (1st Cir. 2014) (*affirming a 60-month term of incarceration (14 months over the Guidelines Sentencing Range) for the cyberstalking of one victim, including by posting intimate information about the victim online*); United States v. Rubens, 696 Fed. Appx. 941 (11th Cir. 2017) (*affirming 120-month term of incarceration for cyberstalking campaign in which defendant photoshopped sexual acts of his victims and posted them online*); United States v. Conlan, 786 F.3d 380 (5th Cir. 2015) (*cyberstalking case of one victim resulting in a ninety-six month term of incarceration*); United States v. Petrovic, 701 F.3d 849 (8th Cir. 2013) (*cyberstalking case of one victim resulting in a ninety-six month term of incarceration*).

The defendant has participated in one the most heinous and sustained campaigns to actively dismantle all aspects of  the lives of the Victims in this case; he used every mode of our technological world and the advanced skillset available to him to try to break them. He used that same skillset to secret child pornography, victimizing and exploiting minor children and continuing their trauma by collecting the worst moments of their lives.

The facts of this case call out for a substantial sentence. The Victims deserve justice finally after all these years!  The government recommends this sentence, one which addresses the severity

of the defendant's crimes, and is appropriate, fair, and reasonable.  The defendant committed heinous, vile, and degrading crimes against his Victims solely for his own sadistic entertainment and sexual perversion. He repeatedly victimized and exploited the Victims for years, all the while purporting to be Jekyll when he was really Hyde all along.  The facts of this case call for a significant sentence. The government believes a 108-month sentence is appropriate and reasonable when considering all the factors enumerated in 18 U.S.C. §3553(a). As such, the government respectfully urges this Court to impose this sentence.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:

LUKE A. GOLDWORM
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will
be sent to those indicated as non-registered participants .

LUKE A. GOLDWORM
Assistant United States Attorney

Date: July 18, 2025