UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) NO. 25-CR-10024-RGS |
| | ) |
| JAMES FLORENCE, JR. | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

James Florence, Jr. pled guilty to counts one through eight of the Information: Cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B) (counts one-seven); and Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) (count eight).

The Court faces a challenging task in this case – to impose a sentence that is just, that is fair, that takes into consideration the harm to the victims, but that is also not greater than necessary to serve the purposes of § 3553(a). For guidance in this task, we ask the Court to take a modified approach to the guideline calculation, in concert with Mr. Florence Jr.'s immediate acceptance of responsibility, his genuine remorse and regard for how his conduct has impacted the victims, and whose life up to this point included no interactions with law enforcement. For a person in his circumstances, his actions and the commensurate punishment are shocking.

We ask the Court to impose a sentence of incarceration of 57 months, followed by 60 months of supervised release. The proposed guideline range in this case, 108-135, does not capture a sentence that satisfies § 3553(a). This is particularly true given Mr. Florence, Jr.'s lack of a criminal record, his unambiguous and uncontested acceptance of responsibility, and the specific nature of this case.

A sentence of 57 months sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a) and will result in a sentence that is "sufficient, but not greater than necessary" to serve the purposes of sentencing. *United States v. Kimbrough*, 128 S. Ct. 558 (2007); *United States v. Booker*, 125 S. Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

**History and Characteristics of Mr. Florence**

James Florence, Jr., is 37 years old and was born in Winchester, Massachusetts. He is a life-long resident of Massachusetts and has strong family ties here. He is the only child born to James Florence, Sr. and Eleanor Florence. Growing up, Mr. Florence Jr.'s father frequently drank alcohol, causing arguments in the home and often leaving home for days at a time. However, this excessive drinking stopped when Mr. Florence, Jr., left for college. Now Mr. Florence Jr. has a close relationship with both of his parents, who have been financially and emotionally supportive of him throughout his detention. Mr. Florence, Sr., is employed as an auto mechanic and Mrs. Florence is an office manager.

Mr. Florence, Jr., wishes he was in a position to reciprocate the care for his parents that they showed to him. Both of Mr. Florence, Jr.'s parents had catastrophic heart attacks. His father's heart attack occurred in May of 2024 and his mother's heart attack occurred in May of 2025. They were almost exactly a year apart. Mr. Florence has struggled knowing that he cannot be there to care for them. His father is still experiencing symptoms such as difficulty with heavy lifting and is in physical therapy. His mother had open heart surgery; she has short breath, cannot go up and down stairs, cannot go outside to walk, and she cannot exercise. While his parents always worked hard to provide for their small family, they do not have significant savings to support them through retirement and with their current medical needs. Mr. Florence, Jr., hopes he

can continue being with his parents as they age, and provide the care they have provided him with since his birth.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████

Mr. Florence, Jr., and his former fiancé had his son in February of 2010. He is a proud father, and was deeply devoted to them until issues began to arise. Their arguments culminated into a shocking moment, when his fiancé left him in the emergency room when he was undergoing an emergency colonoscopy. Mr. Florence moved out, as the relationship problems were overwhelming. His ex-wife later obtained full custody of their son, triggering another flare up of Mr. Florence, Jr.'s health issues due to the stress of not being with his son. Although Mr. Florence, Jr. was allowed to see his son every weekend, every other holiday, and for birthdays for years, his ex-fiancé began to create excuses as to why Mr. Florence, Jr. could not have his son. Eventually, Mr. Florence, Jr., could not stand to see his son so unhappy as he was pulled between his parents, and Mr. Florence, Jr., stopped taking his son. ████████████████████████
███████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

Following the relationship with his ex-fiancé, Mr. Florence was later married – a marriage that ended in a bitter divorce.  After his divorce, Mr. Florence, Jr., moved on several occasions to locations that separated him further from his support network. He was isolated from many friends and family. This only pushed him further into reliance on online-based interactions, particularly during the pandemic. He was also experiencing financial strain and still owes approximately $32,000 in student loan debt (which will continue to skyrocket now as he can no longer make payments).

**Nature of the Offense**

Mr. Florence, Jr. feels deep shame and regret for his behavior. On September 11, 2024, he was arrested by federal authorities and has swiftly accepted responsibility for his actions and pled guilty to an information.

There is an incongruity between Mr. Florence's behavior in the community and his behavior online. He sees the biggest reason for this as his involvement with internet chat rooms that had different values than those with which he was raised. As his social circle became smaller and smaller, and he faced increasing isolation over the years (from his son, losing his partners, moving far from family) he found an online community that he should never have entered. He felt that he was 'chasing' the approval or praise of people inside chat rooms. This led to a cycle of increasingly dangerous and harmful behavior. As is often the case in these chat rooms, there is

a constant search for activity that is increasingly more shocking and more harmful. Mr. Florence, Jr. took an active role in this behavior, to detriment of many women close to him.

The irony of the offense conduct in this case, and its impact on the victims, is that Mr. Florence has often spent much time in the service of others. He has donated to GoFundMe fundraisers, including for a woman artist in another country who lost her husband (in Denmark), and a homeless teenager in Florida, to name a few. On Christmas Day, 2015, there was an 80-year-old woman who was struck by a truck. Mr. Florence witnessed this and ran to take care of her, only to have her die on scene. On a second occasion, Mr. Florence witnessed a different car accident, ran to the scene and helped the driver until EMTs arrived. In 2012, Mr. Florence donated time and services through his employment, with the Arbor Society planting trees near Andover. These examples stand out to him in stark contrast to the harm he caused to others. We remind the Court, and Mr. Florence, Jr. himself of these examples to point to the kind of conduct he is capable of, and where he should be in his life moving forward.

**Mental Health**

While Mr. Florence, Jr., has no diagnostic history of mental health issues or treatment for such problems, he does believe he is anxious and could benefit from mental health treatment in the future. His mother writes that she observed he was experiencing symptoms of depression. Mr. Florence, Jr., agrees with this informal diagnosis and believes this is related to the deterioration of his relationship with his son in 2012 and his chronic health issues after his emergency colonoscopy. This, a series of family deaths, working two jobs and then later, his divorce, had a huge impact on his mental health. While he has never been officially treated or diagnosed, this is certainly a component of why he lands in front of this Court.

**The Sentencing Guideline Range**

For the reasons that follow, Mr. Florence respectfully proposes the Court consider an alternative guideline range of 46-57 months. Without diminishing his prompt and sincere acceptance of responsibility, Mr. Florence, Jr., objects to several enhancements put forward in the Probation Sentencing Report.

a. The Cyberstalking Guideline Should Drive Sentencing

Pursuant to the party's plea agreement, Mr. Florence asks the Court to find a Base Offense Level of 18 and a 2-point enhancement pursuant to s. 2A6.2(b)(1)(E) for the Cyberstalking conduct, Counts 1-7.  While the party's plea agreement did not anticipate the special skill enhancement pursuant to s. 3B1.3, Mr. Florence acknowledges that it is correctly applied. We do object to the obstruction of justice enhancement.  As a result, Mr. Florence proposes that the adjusted subtotal offense level for counts 1-7 should be 22, before applying a reduction for acceptance of responsibility.

It is undoubtable that the most serious offense here, particularly from the perspective of the named victims, is Cyberstalking. Therefore, the Court should allow the Cyberstalking guideline to drive Mr. Florence, Jr.'s sentencing.

b. The Child Pornography Guidelines are Inflated

The plea agreement describes the universe of possible enhancements for count 8, but the Defendant has reserved the right to object to so much of that calculation as overstates the offense conduct or is duplicitous of the underlying crime. For those reasons, we ask that the Court not apply the enhancements described at ¶¶ 123, 124, 125 and 126, resulting in an adjusted offense level subtotal of 18.

Much criticism has been directed at § 2G2.2.[1] The base offense level for child exploitation is 18. The offense level is raised by the imposition of redundant Specific Offense Characteristics. Courts have widely critiqued the child pornography guidelines because of the plethora of "enhancements" that are present in nearly every case. In *United States v. Dorvee*, 616 F.3d 174 (2d. Cir. 2010) the Second Circuit famously analyzed how the mechanical application of the child pornography guideline was "fundamentally incompatible with § 3553(a)," *id.* at 187, as the "enhancements" are "all but inherent to the crime of conviction," and apply in the majority of cases, routinely resulting "in Guidelines projections near or exceeding the statutory maximum." *Id.* at 186. The child pornography guideline is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188. The *Dorvee* Court provided a detailed history of the amendments to the child pornography guidelines and how Congressional interference abrogated the Sentencing Commission's historical role of using empirical data regarding past sentencing practices when pegging current guideline offense levels. *Id*. at 184-85. The court concluded that the amendments effected by the PROTECT Act of 2003 "evince a 'blatant' disregard for the Commission and are 'the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress'". *Id*. at 185 (internal citations omitted). The Third Circuit affirmed a well-below guidelines

---

[1] Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines (Jan. 1, 2009) at 8-9.   The Tenth Circuit has remarked that **"[t]hese modifications do not appear to be based on any sort of empirical data**, and the court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses." *United States v. Regan*, 627 F.3d 1348, 1353 (10th Cir. 2010).  Courts have considered that "the Commission's expertise has been set aside so often because '[c]rimes involving the exploitation of children provide fertile ground for grandstanding politicians.'" *United States v. Kelly*, 868 F.Supp.2d 1202, 1205 (D. N.M. 2012), quoting *United States v. Cunningham*, 680 F.Supp.2d 844, 849 (N. D. Ohio 2010).[1]

sentence in a case in which the sentencing judge was highly critical of the guideline. *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010).

The Sixth Circuit made a distinction between guidelines that are directed by Congress (like much of the child pornography guideline), and guidelines that are chosen by the Commission (like the drug guidelines at issue in *Kimbrough*, which were directly based on congressional policy but not specifically required by Congress). *See United States v. Bistline*, 665 F.3d 758, 763-64 (6th Cir. 2012). With respect to guidelines chosen by the Commission, when the Commission "makes a policy decision for reasons that lie outside its [empirical] expertise," the resulting guideline is "vulnerable on precisely that ground." *Id*.

The First Circuit recognizes and respects the district court's discretion to impose sentences far below the guideline range and has expressed its dissatisfaction with the child pornography sentencing guidelines. In *United States v. Cameron*, 835 F.3d 46 (1st Cir. 2016), Cameron was sentenced to 165 months from a guideline sentencing range of 292 to 365 months, a 43% reduction from the bottom of the sentencing range. Mr. Armstrong, in comparison, is seeking a 38% reduction from the bottom of the sentencing range. Unlike Mr. Armstrong, Cameron had not freely admitted his crimes, had taken the case to trial, and later fled the state "in violation of his release conditions." *Id.* at 48. When discussing the lower sentence, the First Circuit noted "*Kimbrough* itself states that 'district courts must treat the Guidelines as the starting point and the initial benchmark' for their sentencing decisions, although they can vary from those guidelines based on their 'greater familiarity with the individual case and the individual defendant.'" *Id.* at 50 (citation omitted). The court went on to make clear that "it is a judge's prerogative to 'custom-tailor an appropriate sentence' based on the district court's

familiarity with the case and its application of the sentencing factors in 18 U.S.C. § 3553(a)." *Id.* at 52 (quoting *United States v. Flores–Machicote*, 706 F.3d 16, 20 (1st Cir. 2013)).

In *United States v. Stone*, 575 F.3d 83 (1st Cir. 2009), the defendant was given a sentence at the bottom of the guideline range. Unlike Mr. Florence, Jr., in the instant case, Stone had a criminal history, and the crime included distribution of material to someone he believed to be a minor. Even so, while affirming that the District Court did have discretion to impose the sentence that it did, the First Circuit took pains to criticize the district court for failing to use its *Kimbrough* discretion to disregard § 2G2.2, while emphasizing that "we wish to express our view that the sentencing guidelines at issue are in our judgment harsher than necessary . . . [F]irst-offender sentences of this duration are usually reserved for crimes of violence and the like." *Id.* at 97.

In February 2013, the Sentencing Commission released a report to Congress criticizing the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.*

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate

among offenders in terms of their culpability." *Id.* at iii. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *Id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii.

With respect to the enhancement applied at 124, sadistic or masochistic conduct, the same logic applies - if every picture depicting a child that was intended to give pleasure to the viewer based on the child's actual or anticipated pain is considered to sadistic or masochistic, then the enhancement and the actual offense merge. *United States v. Hoey*, 508 F.3d 687 (1st Cir. 2007). This charge already starts at a high base offense level because the

photographs or videos are of children forced to engage in sexual acts. If the majority of the photos are always considered to be sadistic, it's unfair and unreasonable to add this enhancement each time, particularly where the base offense level is already so high; the Court should only add the enhancement when the conduct is so much worse than the baseline case. Here, while technically fitting into the requirements of s. 2G2.2(b)(4)(A), the images are not outside the wheelhouse of standard child pornography.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (*e.g.*, the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23. This logic calls into question the enhancement applied in this case, at ¶ 125 & 126, particularly where Mr. Florence could never be considered a large collector or distributor of child pornography. The charge itself was entirely incidental to the offense conduct in counts 1-7.

When a guideline is increased for reasons outside of empirical evidence, in this case, the application of §2G2.2(b)(2), (b)(4)(A), (b)(6) and n6, (¶¶ 123-126) supporting a change but rather emotion and politics, the Court should set aside that guideline and evaluate the true nature and circumstances of the case, applying the § 3553(a) factors. This principle is in greater force in this case, where the investigation and arrest began as a result of the cyberstalking conduct.

**c. Grouping**

Even with the adjustments to the offense level calculations we propose, the grouping rules at § 3D1.4 would still apply. However, with our proposed calculations, the greater of the adjusted offense levels would be 22, and would arise out of the cyberstalking conduct, with 4 grouping points added, for an adjusted subtotal of 26, with a reduction of 3 points for acceptance of responsibility, our proposed total offense level is 23, resulting in a guideline range of 46-57 months. In light of the length of time the cyberstalking went on for, we believe a sentence at the high end of that range is appropriate.

**d. The Enhancement for Obstruction of Justice is Ill-Fitted for a Just Punishment**

The enhancement under U.S.S.G. § 3C1.1, obstruction of justice, should not be applied because Mr. Florence, Jr., did not willfully obstruct or impede, or attempt to obstruct or impede, the administration of justice when he asked a friend to remove a box located under his bed and place it into his storage unit after Mr. Florence, Jr., was already arrested and the search was complete.

An obstruction of justice enhancement applies if,

(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense…

U.S.S.G. § 3C1.1, cmt. 4. Offers examples of qualifying conduct including: "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so…"

The term "material," refers to a fact, statement, or information that "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. 6; *United States v. Greig*, 717 F.3d 212, 222 (1st Cir. 2013) (upholding district court's application of obstruction of justice enhancement under § 3C1.1 where defendant's misrepresentations to pretrial services regarding their assets were material to issue of bail and advisability of pretrial release); *see United States v. Pineda*, 981 F.2d 569, 574 (1st Cir. 1992) (holding that defendant's failure to acknowledge prior arrest constituted withholding material information pursuant to § 3C1.1 where defendant impeded sentencing court's determination of an appropriate sentence).

Here, law enforcement had already seized the box prior to the phone call from the jail and therefore, this alleged attempt never impeded or obstructed the actual investigation. *See Greig*, 717 F.3d 222; *Pineda*, 981 F.2d 574.

Finally, we remind the court that the Sentencing Guidelines are not mandatory. *United States v. Booker*, 543 U.S. 220, 260-61 (2005). The guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 351 (2007). The Court is free to reject a guideline sentence, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Id.* at 350-351. A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority

of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101-02 (2007) (internal punctuation omitted) (citation omitted). *See United States v. Rodriguez*, 527 F.3d 221, 231 (1st Cir. 2008)

**Conclusion**

We ask the Court to impose a sentence of 57months with 60 months of supervised release to follow so that Mr. Florence, Jr., can be returned to his parents who love him, acknowledge his struggles, and are ready to wholeheartedly support him through his return to the community.

Respectfully submitted,

JAMES FLORENCE

By his attorney,

*/s/ Jessica P. Thrall*
Jessica P. Thrall
#670412
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Jessica P. Thrall, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 18, 2025.

                                                              */s/ Jessica P. Thrall*
                                                              Jessica P. Thrall